UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CRISTINA ARROYO,<br>　　　*Plaintiff*,<br>　　　　*v.*<br>CITY OF BRIDGEPORT and MARK BLACKWELL,<br>　　　*Defendants*. | Civil No. 3:12cv1258 (JBA)<br><br>January 16, 2015 |

Defendants City of Bridgeport (the "City") and Mark Blackwell, a City police officer, move [Doc. ## 44, 46] for summary judgment on Plaintiff Christina Arroyo's claims under 42 U.S.C. § 1983 and for intentional infliction of emotional distress against Blackwell and against the City for its failure to adequately investigate and supervise Blackwell. For the reasons that follow, Defendants' motions are granted as to the § 1983 claims and the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

I.     **Facts**

Shortly after joining the Bridgeport Police Department in June 2007, Officer Arroyo started dating a fellow officer, Defendant Blackwell, whom she had met at the police academy. (Arroyo Aff., Ex. 1 to Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 51] ¶¶ 2–3.) Throughout the course of the relationship Officer Blackwell was "verbally and physically abusive" and during arguments would tell Officer Arroyo that if she ever became involved with another man he would kill her or that he would rather see her die than provide her with backup if they were working a shift together for the police department. (*Id.* ¶ 3.) After Officer Arroyo ended the relationship in April or May 2009, Officer Blackwell telephoned her up to twenty times a day to tell her that he couldn't be without her and

was going to harm himself. (*Id.* ¶ 4.) On one occasion, while they were in the stationhouse, Officer Blackwell threatened to bring a nude video of Officer Arroyo to work and show it to their colleagues and to otherwise "cause [her] problems with [her] employment" if she did not resume their relationship. (*Id.* ¶ 5.) Shortly thereafter, in May 2009, Officer Blackwell called Plaintiff and told her that if she visited him at his home one more time, he would stop harassing her. Officer Arroyo agreed to do so, but when she tried to leave, Officer Blackwell prevented her departure, taking out his service weapon, holding it to his head and proclaiming that he was going to kill himself. Officer Arroyo pleaded with him to put his gun away and said that she was going to call his brother, also a Bridgeport police officer. Officer Blackwell then pulled the trigger, but there was no ammunition and Officer Blackwell said he only wanted to see if Plaintiff still cared about him. (*Id.* ¶ 6.)

Officer Arroyo thereafter managed to leave the house but while she was attempting to get inside her car, Officer Blackwell grabbed her and pulled her into his garage and pleaded with her to have sexual intercourse with him. As Plaintiff cried and demanded to be released, Officer Blackwell put his hands down her pants and into her vagina and then released her. (*Id.* ¶ 7.) The following evening, Officer Blackwell came to Plaintiff's home in full uniform, "so apparently on duty at the time," and banged on Plaintiff's front door for several minutes while she was inside with Paul Scillia, also a Bridgeport police officer whom Plaintiff had started dating. Blackwell left when she did not answer. (*Id.* ¶ 8; Arroyo Dep., Ex. 4 to Blackwell's Loc. R. 56(a)1 Stmt. [Doc. # 44-3] at 71–74.)

The following day, Officer Arroyo learned that Officer Blackwell had spoken with her father and brother and told her father that Plaintiff was involved with another man and threatened Plaintiff's brother that he would divulge their family secrets if the brother would not speak to Plaintiff on Officer Blackwell's behalf. (Internal Affairs Report, Ex. 3 to Pl.'s 56(a)2 Stmt. at 5–7.)

Officer Blackwell continued to "harass and frighten" Plaintiff after this incident while they were both working. (Arroyo Aff. ¶ 10.) A few weeks[1] after Officer Arroyo ended her relationship with Officer Blackwell, she was alone in the police parking lot when Blackwell drove by in a patrol car and yelled out his window, "slut." (Arroyo Dep. at 63, 90–92.) Several months later in 2009, Officer Arroyo was walking by herself into the police department parking lot when she heard someone yell "slut" and saw only Blackwell in the vicinity sitting in his car. (Id. at 92.) Since this incident, Plaintiff has not spoken with Blackwell. (Id. at 84.) Several months later, however, as she was attempting to drive her car out of the police parking lot, Officer Blackwell blocked the exit with his vehicle for several minutes before driving away. (Id. at 86–87.) On at least two occasions, Officer Blackwell stood in Plaintiff's way as she attempted to reach a clipboard to sign out a patrol vehicle and would not move when Plaintiff said "excuse me." He also walked in her way when she tried to enter a building to respond to a burglary alarm in September 2011. (Id. at 89–90, 93–99.) On four occasions after May 2009, Blackwell responded to

---

[1] Plaintiff was unable to recall the approximate dates of the incidents that occurred after her relationship with Officer Blackwell ended. (Arroyo Dep. at 63, 87–90; Pl.'s Responses to Blackwell's 1st Interrogs. Nos. 10–11, Ex. 2 to Pl.'s 56(a)2.)

calls that Officer Arroyo was assigned to, purportedly to provide backup although he was not assigned to the calls and was not needed.  (*Id.* at 103–07.)

On September 9, 2011, Officer Arroyo first reported Officer Blackwell's behavior to Sgt. Ronald Jersey who directed her to submit a written report.  (Mem. from Sgt. Jersey to Capt. Baraja, Sept. 9, 2011, Ex. 4 to Pl.'s 56(a)2 at 1–2.)  In a letter to Sgt. Jersey and Capt. Baraja, dated September 13, 2011, Officer Arroyo outlined her past relationship with Officer Blackwell, his threats of violence, the incident at Officer Blackwell's home involving his service weapon and his sexual assault, and the continued behavior that he exhibited while they worked together.  (Arroyo Mem., Ex. 6 to Pl.'s 56(a)2 at 1–3.)

Officer Arroyo explained that even though the more recent on-duty incidents "may appear insignificant to another individual," she believed they were serious and her "safety [was] in jeopardy if he continue[d] to work in close proximity" because police work "involves the daily potential for life threatening situations" and she "cannot have the additional anxiety of wondering if Officer Blackwell . . . will assist me if the need should arise."  (*Id.* at 2–3.)  Officer Arroyo stated that she had not previously reported Officer Blackwell because she did not want to jeopardize either of their careers and she was afraid because his brother was a lieutenant in the Police Department and appeared to have influence with the Chief of Police, and because she had believed that Officer Blackwell's behavior would stop.  (*Id.* at 3; Arroyo Aff. ⸸ 3.)

After receiving Officer Arroyo's complaint, Sgt. Jersey and Capt. Baraja, directed Officer Blackwell to return to headquarters so that they could speak with him.  Officer Blackwell acknowledged that he had previously dated Officer Arroyo but claimed that he had not had any contact with her since their relationship ended over two years prior and

that he was unaware that Officer Arroyo was uncomfortable with his behavior.  (Jersey Mem. at 2.)  Capt. Baraja responded that Officer Arroyo may have "misconstrued" some of his behavior and that "the complaint appeared to more of [Officer] Arroyo's perception and that [he] need . . . not worry." (Jersey Mem. at 2; Blackwell Report, Ex. 5 to Pl.'s 56(a)2 at 1.)  Sgt. Jersey told Officer Blackwell to "just keep doing good police work." (Blackwell Report at 1.)  The following day while Officer Blackwell was assisting Sgt. Jersey on a call, Sgt. Jersey told him that Capt. Baraja "was the one pushing the issue," Sgt. Jersey "wanted to maintain a good working relationship with" Officer Blackwell and that Officer Arroyo's complaint "appeared to be based on her perception." (*Id.* at 2.)

On September 22, 2011, Lt. Garcia forwarded Officer Arroyo's complaint to the Office of the City Attorney for Bridgeport for "a legal opinion regarding the scope of [Officer] Arroyo's complaint" and to determine whether it required the Department's Office of Internal Affairs to investigate it as a potential violation of the Department's policy prohibiting sexual harassment.  (Memorandum from Lt. Garcia to Betsy Edwards, Sept. 22, 2011, Ex. B to City's Loc. R. 56(a)1 Stmt. [Doc. # 46-1] at 1; Memorandum from Betsy Edwards to Lt. Garcia, Dec. 5, 2011, Ex. 11 to Pl.'s 56(a)2 at 1–2.)  In a written response on December 5, 2011, an attorney from the City Attorney's Office concluded that Officer Blackwell's threats to expose a nude video of Officer Arroyo and his referring to her as a "slut" "sufficiently implicates the policy's definition of sexual harassment . . . to require an investigation by the Office of Internal Affairs." (*Id.* at 3.)  On December 19, 2011, Chief Gaudett directed Lt. Garcia to initiate an internal affairs investigation. (Memorandum Gaudett to Garcia, Ex. F to City's 56(a)2.)

On January 3, 2012, investigators from Internal Affairs interviewed Officer Arroyo, who told them that she continued to feel unsafe because she was still required to work with Officer Blackwell four days a week although there had been no new incidents since her initial report in September 2011.  (Memorandum from Sgt. Leonzi Jr. to Lt. Garcia, Jan. 5, 2012, Ex. 14 to Pl.'s 56(a)2 at 1; Arroyo Dep. at 103.)  On January 5, 2012, Sergeant Leonzi drafted a memorandum to Lieutenant Garcia (Ex. 14 to Pl.'s 56(a)2) recommending that due to Plaintiff's expressed fears, the officers be reassigned "for the safety of all involved."

At some unspecified point thereafter, Plaintiff's schedule was changed so that she worked with Officer Blackwell only one day per week.  However on May 8, 2012 her assignment was changed and she was again required her to work with Defendant Blackwell four days per week.  (Arroyo Aff. ¶ 14.)  Officer Arroyo expressed concern about this change to the Internal Affairs office but was told to speak with Sgt. Rivera, who said that Plaintiff had been "accommodated enough" and "openly mocked" her.  (Arroyo May 15, 2012 Ltr. to Internal Affairs, Ex. 16 to Pl.'s 56(a)2.)  Only after Plaintiff retained legal counsel and the City Attorney's Office intervened, did the Chief of the Department cancel the transfer.  (Email Mark T. Anastasi to Chief Gaudett, May 23, 2012, Ex. 17 to Pl.'s 56(a)2.)  On May 25, 2012, Captain Stolze informed Plaintiff that she would return to her previous assignment and spoke to her in a "mocking" tone.  (Pl.'s Response to Def.'s Interrogatory 17, Ex. 2 to Pl.'s 56(a)2.)  Shortly thereafter, Captain Gearing stated in a sarcastic manner "really, really, you cannot work with Officer Blackwell" and "continued to badger" her and made her feel intimidated.  (Id.; Arroyo Aff. ¶ 17.).

An Internal Affairs Report, dated December 4, 2012 (Ex. 1 to City's 56(a)1 Stmt.) concluded that Officer Arroyo's allegations of sexual assault and verbal harassment "cannot be proven" because there were "no supporting facts or evidence." (*Id.* at 17.) However, the report concluded that Officer Blackwell had engaged in conduct unbecoming of an officer in violation of Department rules based on his late-night visit to Officer Arroyo's residence while she was with Officer Scillia, his visits with Officer Arroyo's father and brother, and his responding to Officer Arroyo's calls outside of his sector without being dispatched or notifying the dispatcher that he would respond. (*Id.* at 18–19.)   On December 17, 2013, Chief Gaudett imposed a written warning on Officer Blackwell as discipline (Personnel Order, Ex. 7 to Pl.'s 56(a)2), which he "flagged for removal" from Officer Blackwell's personnel folder within six months rather than the customary one year period (Memorandum from Sgt. Dickerson to Sgt. Hernandez, Ex. 9 to Pl.'s 56(a)2; Gaudett Dep. at 122).   Chief Gaudett waited a year to impose discipline because he "thought it was better that it sit there for a while" and then decided to withdraw the discipline from Officer Blackwell's personnel file in six months rather than a year due to the fact that it took so long to investigate the complaint and impose discipline. (Gaudett Dep. at 122–23.)

## II.     Discussion[2]

### A.     Claims against the City for Failure to Supervise and Investigate

The City argues that it cannot be held liable under § 1983 for Officer Blackwell's actions because Plaintiff has failed to establish that it caused any violation of her constitutional rights.  (City's Mem. Supp. [Doc. # 46-2] at 7.)  "In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690–91 (1978)).  "[S]ex-based discrimination, including sexual harassment, may be actionable under

---

[2] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

§ 1983 as a violation of equal protection." *Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir. 1996).[3]

The Supreme Court has interpreted § 1983's causation requirement as being inconsistent with the imposition of vicarious or *respondeat superior* liability on a municipality for the torts of its employees, *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007), and thus "[t]he fifth element—the 'official policy' element—can only be satisfied where a plaintiff proves that a 'municipal policy of some nature caused a constitutional tort,'" *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (quoting *Monell,* 436 U.S. at 691). "'In other words, a municipality may not be found liable simply because one of its employees committed a tort'" and "a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Id.* at 36–37 (quoting *Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 405 (1997)).

Where a municipality's failure to train or supervise its employees "evidences a 'deliberate indifference' to the rights of its inhabitants" such that it "reflects a 'deliberate' or 'conscious' choice by a municipality . . . a city [will] be liable for such a failure under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989). "Because

---

[3] Section 1983 provides, in pertinent part:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

respondeat superior liability is not permissible, however, the courts must apply 'rigorous standards of culpability and causation . . . to ensure that' the indirect-causation theory not result in the municipality's being 'held liable solely for the actions of its employee.'" *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (quoting *Brown*, 520 U.S. at 405).

Plaintiff contends that "the actions and inaction taken by the City of Bridgeport after she filed her complaint served only further to create a hostile work environment for the plaintiff" and that it is liable for its failure to properly investigate and discipline Officer Blackwell.[4]   (Pl.'s Opp'n to City at 15, 17.)   In support of this claim, Plaintiff identifies a number of claimed deficiencies in the City's response to her complaint: (1) it failed to initiate an investigation of Plaintiff's complaint until over three months after it was filed, (2) the investigation took nearly one year to complete, (3) after the investigation was complete, the City waited an additional year to hold a disciplinary hearing, and (4) it imposed on Officer Blackwell only a written warning, which was to be removed from his personnel file after six months rather than a year.

While a reasonable jury could readily conclude that Plaintiff's superiors exhibited a deliberate indifference to her plight, this deliberate indifference could not have caused Plaintiff's constitutional injuries, because it is undisputed that despite her superiors' failure to address Plaintiff's complaints, after she first alerted the City of Officer Blackwell's conduct in September 2011, there were no further incidents of harassment. "[T]he United States Constitution does not grant plaintiffs a right to an adequate investigation or adequate after-the-fact punishment," *Santossio v. City of Bridgeport*, No.

---

[4] Plaintiff's opposition brief clarifies that she does not assert a claim that the City failed to adequately train Blackwell.  (Pl.'s Opp'n at 12–13.)

3:01CV1460 (RNC), 2004 WL 2381559, at *4 (D. Conn. Sept. 28, 2004) *aff'd*, 186 F. App'x

130 (2d Cir. 2006), and in order to state a claim under § 1983, Plaintiff must show that the

City's deliberate failure to investigate her allegations was the cause of constitutional

violations, *see Jeffes*, 208 F.3d at 61.[5]   Even assuming that the City's investigation of her

complaint was deficient in many respects, there is no evidence from which a factfinder

could reasonably conclude that the City's inaction caused Plaintiff to suffer a

constitutional deprivation, because no further acts of harassment occurred after her

complaints were lodge.  *See Blount v. Swiderski*, No. 2:03CV23 (ENV), 2006 WL 3314635,

at *14 n.6 (E.D.N.Y. Nov. 14, 2006) ("The defendant-supervisors' failures in an after-the-

---

[5] Although there is no constitutional right to an investigation *per se*, "under some circumstances a state may be guilty of an equal protection violation if it denies disfavored individuals protections and benefits that it freely grants to others," *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992), but such a theory requires proof of discriminatory intent, such as that that the complainant was (1) treated differently from other similarly situated individuals and (2) that such differential treatment was based on impermissible considerations such as gender or intent to inhibit the exercise of constitutional rights, *Harlen Associates v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  Plaintiff does not advance such a theory but rather contends that the failure to adequately investigate "demonstrated reckless indifference" to her rights.  (Compl. ¶ 24.)  Nor has Plaintiff adduced any evidence to support such a theory, such as that the City intentionally treated complaints from male officers differently than those of similarly situated female officers. *See Levin*, 966 F.2d at 90–91 ("[T]here is no evidence that the College treated student demonstrations directed at Professor Levin any differently than other student demonstrations . . . ."); *Daniels v. City of Binghamton*, No. 3:95-CV-688, 1998 WL 357336, at *5 (N.D.N.Y. June 29, 1998) (granting defendant summary judgment where the plaintiff offered no evidence that the defendant acted with a discriminatory purpose, such as "any evidence regarding similar investigations involving white complainants" and thus there was "no basis upon which a reasonable fact finder could conclude that [the defendant] treated plaintiff differently because of his race.").  Likewise, Plaintiff has not alleged that the City's treatment of her after she filed her complaint and its failure to properly investigate was retaliation against her for filing a complaint.

fact investigation cannot, standing alone, be said to have caused the underlying deprivation of rights, and thus cannot be a basis of supervisory liability.").

By contrast in *Stevens v. City of Bridgeport*, 607 F. Supp. 2d 342, 353 (D. Conn. 2009) cited by Plaintiff, the City was denied summary judgment because the officer accused of harassment remained in a supervisory position for two months after the complaint and thereafter continued to harass the plaintiff and had a prior record of harassing other officers. The court therefore concluded that the plaintiff had "presented an issue of fact as to whether, by the time of [the plaintiff's] written complaint, especially given [the defendant's] past history, the Department needed to act more quickly in order to adequately respond" to eliminate the unconstitutional hostile work environment. *Id.* at 355. Because unlike in *Stevens*, there is no evidence that Officer Blackwell's harassment continued after the City became aware of it or that the City was aware of the need to increase supervision of him going forward, Plaintiff has not shown that the City caused a deprivation of any constitutional right and thus the City's Motion for Summary Judgment is granted.

### B.    Claims against Blackwell

#### 1.    *Color of Law*

Plaintiff's claim against Defendant Blackwell for deprivation of her right to equal protection under the Fourteenth Amendment requires Plaintiff to show that Defendant was acting under color state law. *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v.*

*Atkins*, 487 U.S. 42, 48 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)). "Mere employment by a state or municipality" is not sufficient on its own.  *Kern*, 93 F.3d at 43.

Some courts have held that a § 1983 hostile work environment claim against an individual in his or her personal capacity "ordinarily requires that the harasser be a supervisor or have some position of authority or control over the plaintiff.  Otherwise, it is difficult to establish that the abusive action was perpetrated 'under color of state law' rather than as an essentially private act of sexual harassment."  *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 355 (E.D.N.Y. 1999) (internal citations, quotation marks and alterations omitted) (collecting cases).  However, the Second Circuit has also found the color of law requirement satisfied where constitutional deprivations "were committed by state employees acting in their official capacities . . . and exercising their responsibilities pursuant to state law."  *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004); *see also Pugliese v. Long Island R.R. Co.*, No. 01 CV 7174 (NGG), 2006 WL 2689600, at *6 (E.D.N.Y. Sept. 19, 2006) (noting that "it is unclear the extent of authority that the defendants had over the plaintiff in *Feingold,*" but concluding that "it is factually distinguishable" where the defendant "is clearly subordinate (even if not directly so) to [the plaintiff], and did not possess 'power by virtue of state law' to then misuse").

Although "it is clear that 'personal pursuits' of police officers do not give rise to section 1983 liability, there is no bright line test for distinguishing 'personal pursuits' from activities taken under color of law."  *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994).  "More is required than a simple determination as to whether an officer was on or off duty when the challenged incident occurred" and "liability may be found where a

police officer, albeit off-duty, nonetheless invokes the real or apparent power of the police department" or "where off-duty police officers perform duties prescribed generally for police officers." *Id.* "In short, courts look to the nature of the officer's act, not simply his duty status." *Id.* For example, in *Pitchell*, a police officer who shot a man in the officer's apartment using his personal weapon but bullets issued by the police department while the two were drinking together was not acting under color of law, because "he was not acting in accordance with a police regulation, . . . nor was he invoking the authority of the police department as in the pretense of law cases" and instead he "was an off-duty cop, who while drunk in his own home, used his own personal weapon to shoot a guest." *Id.*

By contrast in *Rivera v. La Porte*, 896 F.2d 691, 696 (2d Cir. 1990), an off-duty corrections officer who arrested the plaintiff after a personal dispute while carrying handcuffs issued by his employer and his "off-duty" revolver was acting under color of law, because although "the dispute that precipitated the arrest was private, the response, including the arrest and the use of excessive force, was unquestionably action under color of law." *Cf. Bonsignore v. City of New York*, 683 F.2d 635, 638–39 (2d Cir. 1982) (off-duty police officer who was required by the police department to carry a gun at all times was not acting under color of law when he shot his wife using his "off-duty" weapon, but rather acted "in the ambit of (his) personal pursuits").

Plaintiff acknowledges that Defendant Blackwell's status as a police officer is not sufficient on its own to satisfy the color of law requirement, but she contends that he was acting under color of law because during the May 2009 incident, "he made a conscious decision to draw his police issued service revolver," and he had previously told her "that he would rather see her die than back her up while on duty." (Pl.'s Opp'n to Blackwell at

14

15–16.)  As *Pitchell* and *Bonsignore* demonstrate, the fact that Defendant Blackwell used his service weapon to threaten himself and Plaintiff does not on its own indicate that he was acting under color of law.  That both officers were off-duty and at Defendant's home discussing their personal relationship at the time of the incident demonstrates that Officer Blackwell was not, in fact, acting under color of law.

The other incidents of alleged harassment occurred after Plaintiff ended her relationship with Blackwell in May 2009 and consist of Blackwell: (1) twice calling Plaintiff a "slut", (2) blocking Plaintiff's car from leaving the Department parking lot, (3) impeding her access to a patrol car sign out sheet, (4) threatening to share a compromising video of her, (5) blocking her way when she was trying to enter a building in response to a call, (6) responding to calls that Officer Arroyo was assigned to and providing backup although he was not assigned to such calls and not needed, and (7) spitting near her feet.

The fact that these offensive incidents occurred while Blackwell was on duty is not sufficient on its own without evidence that his actions were related to the authority conferred upon him by the state.  *See Burns v. City of Utica*, No. 14-706-CV, 2014 WL 5785554, at *4 (2d Cir. Nov. 7, 2014) (sexual assault by a male firefighter against his female colleague while both were working at the firehouse "was palpably a personal pursuit entirely unrelated to his duties as a firefighter" and "therefore not committed under the color of state law"); *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir. 1991) ("Actions taken under color of state law must be related to the state authority conferred on the actor, even though the actions are not actually permitted by the authority.  Here, however, the abusive conduct was not in any way related to the duties

15

and powers incidental to the job . . . .  For conduct to relate to state authority, it must bear some similarity to the nature of the powers and duties assigned to the defendants." (internal quotation marks and alterations omitted)).  Plaintiff has offered no evidence from which it can be inferred that Blackwell invoked his authority as a police officer to insult and threaten Plaintiff.  Instead the undisputed evidence shows that each incident amounted to a private act of harassment that occurred while Defendant was in the workplace but not acting under color of state law.

However, Defendant's threat while they were dating that he would let her die rather than providing backup while on duty is a different matter because "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."  *Classic*, 313 U.S. at 326; *United States v. Giordano*, 442 F.3d 30, 44 (2d Cir. 2006) ("[W]e have found that officials acted under color of law when their misuse of official power made the commission of a constitutional wrong possible, even though the official committed abusive acts for personal reasons far removed from the scope of official duties.").  For example, in *Giordano,* the Second Circuit held that the Mayor of Waterbury had acted under color of law when he engaged in sexual misconduct with underage girls because the Mayor had "threatened his victims by invoking a 'special authority' to undertake retaliatory action" and had "used his authority to . . . caus[e] the victims to fear that he would use his power to harm them if they reported the abuse."  *Id.* at 45.[6]

---

[6] The *Giordano* analysis was conducted pursuant to a conviction under 18 U.S.C. § 242, but the Second Circuit noted that the analysis would be "identical" under § 1983. 442 F.3d at 42 n.16.

As Plaintiff correctly notes, such a threat could only be carried out by virtue of Blackwell's position as a police officer, and his obligation to provide the backup that he threatened to withhold also arose from this position.  As in *Giordano*, the relevant inquiry is whether Defendant invoked his authority as a police officer even if in doing so he was misusing his authority for personal reasons outside the scope of his official duties.  Because Blackwell's threat was an invocation of his authority and responsibility as a police officer, he acted under color of law in threatening to withhold backup.

### 2.    Statute of Limitations

However, this sole actionable act of harassment from before May 2009 is time-barred under the applicable three-year statute of limitations.[7]  *See Walker v. Jastremski*, 159 F.3d 117, 119 (2d Cir. 1998).  Plaintiff contends that her claim is nevertheless timely under the continuing course of conduct doctrine (Pl.'s Opp'n to Blackwell at 17) whereby a suit can be "delayed until a series of wrongful acts blossoms into an injury on which suit can be brought," *Vaden v. Connecticut*, 557 F. Supp. 2d 279, 284 (D. Conn. 2008) (quoting *Limestone Dev. Corp. v. Vill. of Lemont,* 520 F.3d 797 (7th Cir. 2008)).  But the doctrine is only applicable where there is "a showing of specific and related instances of discrimination," one or more of which occurred during the limitations period.  *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir. 2001).  As discussed above, there are no other actionable instances of harassment to which Blackwell's threat to withhold back-up could be linked for purposes of the continuing course of conduct doctrine and therefore Plaintiff has not shown that there were any non-time barred constitutional deprivations

---

[7] The Complaint was filed on August 28, 2012 and thus any claims predating August 28, 2009 are time-barred.

actionable under § 1983.  *See Washington v. Cnty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004) (doctrine does not apply to "a single act, discrete in its nature" that was actionable on its own and not part of a "continuous or ongoing policy or practice").  Accordingly, Defendant Blackwell's Motion for Summary Judgment is granted

  **C.**  **Remaining State Law Claim**

   Where, as here, a federal court has dismissed before trial the only basis for federal jurisdiction, it has discretion under 28 U.S.C. § 1367(c) to either retain or decline jurisdiction over any remaining state law claims.  *See Osborn v. Haley*, 549 U.S. 225, 245 (2007).  A "federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.* at 350 n.7. Weighing these factors, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim for intentional infliction of emotional distress.

III.     **Conclusion**

Defendants' Motions [Doc. ## 44, 46] for Summary Judgment are GRANTED as to the federal claims and the Court declines to exercise jurisdiction over the remaining state law claim against Defendant Blackwell.  The Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 16th day of January, 2015.